**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | |
|---|---|
| XR COMMUNICATIONS, LLC, dba VIVATO TECHNOLOGIES,<br><br>Plaintiff,<br>v.<br>SAM'S WEST, INC. D/B/A SAM'S CLUB; AND SAM'S EAST, INC. D/B/A SAM'S CLUB,<br>Defendants. | Case No. 2:26-cv- 01047<br><br>JURY TRIAL DEMANDED |

**COMPLAINT FOR PATENT INFRINGEMENT**

This is an action for patent infringement arising under the Patent Laws of the United States of America, 35 U.S.C. § 1 *et seq.*, in which Plaintiff XR Communications LLC d/b/a Vivato Technologies ("Plaintiff" or "Vivato") makes the following allegations against Defendants Sam's West, Inc. and Sam's East, Inc., each d/b/a Sam's Club (collectively, "Defendants" or "Sam's Club"):

**INTRODUCTION**

1. This complaint arises from Defendants' unlawful infringement of United States Patent No. 8,289,939 (the "'939 Patent" or the "Asserted Patent"), which generally relates to wireless communication technology and, in particular, to coordinating signal transmission and reception among multiple wireless access points. Sam's Club sells, offers to sell, and uses Wi-Fi 7 wireless routers and mesh Wi-Fi systems that practice the '939 Patent, both in its warehouse clubs (including twelve clubs in this District) and through its www.samsclub.com website and the Sam's Club mobile application. Sam's Club's own product summary for one of those routers tells its members that "Multi-Link Operation lets multiple family members stream and game at the same

time," the very Wi-Fi 7 functionality that practices the '939 Patent.

2. Countless electronic devices today connect to the Internet wirelessly. Beyond just connecting our devices together, wireless networks have become an inseparable part of our lives in our homes, our offices, and our neighborhood coffee shops. In even our most crowded spaces, today's wireless technology allows all of us to communicate with each other, on our own devices, at virtually the same time. Our connected world would be unrecognizable without the ubiquity of sophisticated wireless networking technology.

3. Just a few decades ago, wireless technology of this kind could only be found in science fiction. The underlying science behind wireless communications can be traced back to the development of "wireless telegraphy" in the nineteenth century. Guglielmo Marconi is credited with developing the first practical radio, and in 1896, Guglielmo Marconi was awarded British patent 12039, Improvements in transmitting electrical impulses and signals and in apparatus therefor, the first patent to issue for a Herzian wave-based wireless telegraphic system. Marconi would go on to win the Nobel Prize in Physics in 1909 for his contributions to the field.

4. One of Marconi's preeminent contemporaries was Dr. Karl Ferdinand Braun, who shared the 1909 Nobel Prize in Physics with Marconi. In his Nobel lecture dated December 11, 1909, Braun explained that he was inspired to work on wireless technology by Marconi's own experiments. Braun had observed that the signal strength in Marconi's radio was limited beyond a certain distance, and wondered why increasing the voltage on Marconi's radio did not result in a stronger transmission at greater distances. Braun thus dedicated himself to developing wireless devices with a stronger, more effective transmission capability.

5. In 1905, Braun invented the first phased array antenna. This phased array antenna featured three antennas carefully positioned relative to one another with a specific phase

relationship so that the radio waves output from each antenna could add together to increase radiation in a desired direction. This design allowed Braun's phased array antenna to transmit a directed signal.

6. Building on the fundamental breakthrough that radio transmissions can be *directed* according to a specific radiation pattern through the use of a phased array antenna, directed wireless communication technology has developed many applications over the years. Braun's invention led to further developments in radar, smart antennas, and, eventually, to a technology known as "MIMO," or "multiple-input, multiple-output," which would ultimately allow a single radio channel to receive and transmit multiple data signals simultaneously. Along the way, engineers have worked tirelessly to overcome limitations and roadblocks directed wireless communication technology.

7. At the beginning of the twenty-first century, the vast majority of wireless networks still did not yet take advantage of directed wireless communications. Instead, "omnidirectional" access points and base stations were ubiquitous. Omnidirectional base stations transmit radio waves uniformly around the base station in every direction and do not steer the signal in particular directions. Omnidirectional antenna base stations do typically achieve 360 degrees of coverage around the base station, but with a reduced coverage distance. Omnidirectional base stations also lack sophisticated approaches to overcome certain types of interference in the environment. As only one example, the presence of solid obstructions, such as a building, can limit signal penetration. As another example, interference arises when radio waves are reflected, refracted, or diffracted based on obstacles present between the transmitter and receiver. The multiple paths that radio waves can travel between the transmitter and receiver often result in signal interference that decreases performance, and omnidirectional base stations lack advanced solutions to overcome

these "multipath" effects.

8. Moving from omnidirectional networks to modern networks has required an additional series of advancements that harness the capabilities of directed wireless technology. These advancements range from conceiving various ways to steer and modify radiation patterns, to enhancing the transmission signal power in a desired direction, to suppressing radiation in undesired directions, to minimizing signal "noise," and then applying these new approaches into communications networks with multiple, heterogenous transmitters and receivers.

9. Harnessing the capabilities of directed wireless technology resulted in a significant leap forward in the signal strength, reliability, concurrent users, and/or data transmission capability of a wireless network. One of the fundamental building blocks of this latest transition was the development of improvements to MIMO and "beamforming," and to the coordination of transmission and reception among multiple access points, which are the subject matter of the patent in this infringement action that resulted from the investment of tens of millions of dollars and years of tireless effort by a group of engineers who built a technology company slightly ahead of its time. Their patented innovations laid the groundwork for today's networks, including the Wi-Fi 7 products that Sam's Club sells, and are infringed by Defendants.

## THE PARTIES

10. Plaintiff XR Communications, LLC, d/b/a Vivato Technologies ("Vivato" or "Plaintiff") is a limited liability company organized and existing under the laws of the State of Delaware with its principal place of business at 2802 Wildcreek Ct., Keller, TX 76248. Vivato is the sole owner by assignment of all right, title, and interest in the Asserted Patent.

11. Vivato was founded in 2000 as an $80+ million venture-backed company with several key innovators in the wireless communication field including Siavash Alamouti, Ken Biba,

William Crilly, James Brennan, Edward Casas, and Vahid Tarokh, among many others. At that time, "Wi-Fi" or "802.11" had become the prominent means of wireless connection to the Internet, integrated into hundreds of millions of mobile devices globally. Vivato was founded to leverage its talent to generate intellectual property and deliver Wi-Fi/802.11 wireless connectivity solutions to service the growing demand for bandwidth.

12. Vivato has accomplished significant innovations in the field of wireless communications technology. One area of focus at Vivato was the development of advanced wireless systems with sophisticated antenna designs to improve wireless speed, coverage, and reliability. Vivato also focused on designing wireless systems that maximize the efficient use of spectrum and wireless resources for large numbers of connected mobile devices. Ultimately, Vivato's accomplishments expanded beyond "Wi-Fi" and "802.11"-based networks.

13. Vivato's inventions and technology, particularly relating to "MIMO" and beamforming, also apply to wireless communication apart from WiFi, such as communication using cellular networks. Indeed, Vivato's earliest products focused on achieving wireless communication over much longer ranges (i.e., several miles) as compared to a traditional 802.11 Wi-Fi access point.

14. Among many fundamental breakthroughs achieved by Vivato are inventions that allow for intelligent and adaptive beamforming based on up-to-date information about the wireless medium, as well as adaptive beamforming in larger base stations accommodating many beams and many users. Through these and many other inventions, Vivato's engineers pioneered a wireless technology that provides for simultaneous transmission and reception, a significant leap forward over conventional wireless technology.

15. Over the years, Vivato has developed proven technology, with over 400

deployments globally, including private, public and government, and it has become a recognized provider of extended range wireless network infrastructure solutions. Vivato's wireless base stations integrate beamforming phased array antenna design with packet steering technology to deliver high-bandwidth extended range connections to serve multiple users and multiple devices.

16. Vivato's patent portfolio includes over 17 issued patents and pending patent applications. The patented technology at issue in this case is directed to specific aspects of wireless communication, including the coordination of signal transmission and reception among a plurality of wireless access points.

17. On information and belief, Defendant Sam's West, Inc. ("Sam's West") is a corporation organized and existing under the laws of the State of Arkansas, with its principal place of business at 2101 SE Simple Savings Drive, Bentonville, Arkansas 72712, and does business as "Sam's Club." Sam's West is the entity that Sam's Club's published terms identify as "Sam's Club." *See* https://scene7.samsclub.com/is/content/samsclub/export-member-agreement (Sam's Club Export Terms and Conditions, which "apply to all export transactions between Sam's West, Inc. ('Sam's Club') and any member"); https://help.samsclub.com/app/answers/detail/a_id/4075 (Sam's Club Terms and Conditions, last updated November 6, 2026, describing the Sam's Club travel site as "owned and maintained by Sam's West, Inc. ('Sam's Club,' 'we,' 'We,' 'us,' 'Us')"). On information and belief, Sam's West operates the www.samsclub.com website and the Sam's Club mobile application, through which it sells and ships products to members throughout the United States, including members in this District; the Texas Comptroller of Public Accounts' records of active sales tax permit holders list, as an outlet of Sam's West, Inc., a facility in Fort Worth, Texas identified as "SAMS.COM DC." See https://data.texas.gov/Government-and-Taxes/Active-Sales-Tax-Permit-Holders/jrea-zgmq. On information and belief, Sam's West is

registered to do business in Texas and may be served through its registered agent for service in Texas, CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

18. On information and belief, Defendant Sam's East, Inc. ("Sam's East") is a corporation organized and existing under the laws of the State of Arkansas, with its principal place of business in Bentonville, Arkansas, and does business as "Sam's Club." On information and belief, Sam's East owns or leases, operates, and staffs the Sam's Club warehouse clubs in Texas, including the clubs in this District identified below. The Texas Comptroller of Public Accounts' records of active sales tax permit holders list each of those clubs as an outlet of Sam's East, Inc. See https://data.texas.gov/Government-and-Taxes/Active-Sales-Tax-Permit-Holders/jrea-zgmq. On information and belief, Sam's East is registered to do business in Texas and may be served through its registered agent for service in Texas, CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

19. On information and belief, Defendants are wholly owned subsidiaries of Walmart Inc. and together operate, as a single, integrated enterprise under the "Sam's Club" name and brand, the business that Walmart Inc. reports as its Sam's Club U.S. segment. Walmart Inc.'s annual report for the fiscal year ended January 31, 2026 lists "Sam's West, Inc." and "Sam's East, Inc." among the "Significant Subsidiaries of Walmart Inc.," each as an Arkansas entity in which Walmart Inc. owns, directly or indirectly, 100% of the equity securities and each doing business under the name "Sam's Club." See https://www.sec.gov/Archives/edgar/data/104169/000010416926000055/wmtexhibit21fy26.htm. Walmart Inc. reports that "Sam's Club U.S. is a membership-only warehouse club that operates 601 clubs in 44 states in the U.S. and Puerto Rico and also operates samsclub.com and the Sam's Club mobile application," and that "Sam's Club U.S. provides a fast and seamless omnichannel

experience to members, integrating physical clubs and eCommerce." *See* https://www.sec.gov/Archives/edgar/data/104169/000010416926000055/wmt-20260131.htm. Walmart reports 82 Sam's Club locations in Texas. *See* https://corporate.walmart.com/about/location-facts/united-states/texas. Products ordered on www.samsclub.com may be picked up at, delivered from, and returned to Sam's Club clubs, and Sam's Club provides consumer-electronics products and services, including the Accused Products and the Wi-Fi installation services described below, to its members throughout the State of Texas, including in the Eastern District of Texas.

## JURISDICTION AND VENUE

20. This action arises under the patent laws of the United States, Title 35 of the United States Code § 1, et seq, including 35 U.S.C. §§ 271, 281, 283, 284, and 285. This Court has original subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

21. This Court has personal jurisdiction over each Defendant in this action because each Defendant has committed acts within this District giving rise to this action and has established minimum contacts with this forum such that the exercise of jurisdiction over it would not offend traditional notions of fair play and substantial justice. Defendants, directly and through agents or intermediaries, have committed and continue to commit acts of infringement in this District by, among other things, using, offering to sell, selling, and importing products that infringe the Asserted Patent, and by inducing and contributing to the infringement of the Asserted Patent, in this District. Defendants are, directly and through intermediaries, using, selling, offering for sale, distributing, advertising, promoting, and otherwise commercializing the Accused Products in this District, including through the Sam's Club clubs located in this District and through sales made on www.samsclub.com or through the Sam's Club mobile application to members in this District.

Defendants regularly conduct and solicit business in, engage in other persistent courses of conduct in, and derive substantial revenue from goods and services provided to the residents of this District and the State of Texas. Defendants are subject to jurisdiction pursuant to due process and/or the Texas Long Arm Statute due to their substantial business in this State and District including at least their infringing activities, regularly doing or soliciting business at their Texas facilities, and engaging in persistent conduct and deriving substantial revenues from goods and services provided to residents in the State of Texas including the Eastern District of Texas.

22. Defendants, directly and/or through intermediaries, have purposefully and voluntarily placed one or more products and/or services in the stream of commerce that practice the Asserted Patent with the intention and expectation that they will be purchased and used by consumers in the Eastern District of Texas. These products and/or services have been and continue to be purchased and used in the Eastern District of Texas.

23. Venue is proper in this District under 28 U.S.C. § 1400(b) because each Defendant has committed acts of infringement in this District and has a regular and established place of business in this District, as set forth below. On information and belief, Defendants are registered to do business in Texas, have transacted business in this District, and have committed acts of direct and indirect infringement in this District by, among other things, using, offering to sell, selling, and importing products that infringe the Asserted Patent.

24. Sam's East owns or leases, operates, staffs, and conducts business from twelve Sam's Club warehouse clubs in this District: Plano (Spring Creek), Club No. 4743, 1200 E. Spring Creek Parkway, Plano, Texas 75074; Plano (Coit Road), Club No. 8299, 301 Coit Road, Plano, Texas 75075; Plano (Ohio Drive), Club No. 6255, 8621 Ohio Drive, Plano, Texas 75024; McKinney, Club No. 4906, 1670 W. University Drive, McKinney, Texas 75069; Denton, Club

No. 4905, 2850 W. University Drive, Denton, Texas 76201; Lewisville, Club No. 6381, 751 W. Main Street, Lewisville, Texas 75067; Sherman, Club No. 6350, 3333 N. U.S. Highway 75, Sherman, Texas 75090; Longview, Club No. 6422, 3310 N. 4th Street, Longview, Texas 75605; Tyler, Club No. 8284, 2025 S. Southwest Loop 323, Tyler, Texas 75701; Texarkana, Club No. 8295, 3610 Saint Michael Drive, Texarkana, Texas 75503; Lufkin, Club No. 6202, 407 N. Brentwood, Lufkin, Texas 75904; and Beaumont, Club No. 8275, 1615 Interstate 10 South, Beaumont, Texas 77701. *See* https://www.samsclub.com/club-directory/tx; https://www.samsclub.com/club/8284-tyler-tx. Sam's Club publishes a page for each club on www.samsclub.com; its page for each of these clubs lists "Computers" and "TV & Electronics" among the club's departments. Each of these clubs is a physical, permanent retail location in this District from which Sam's East, through its employees, regularly sells and offers to sell consumer electronics to Sam's Club members, including, on information and belief, the Accused Products, and from which members pick up, receive same-day delivery of, and return products purchased from Sam's Club. For example, as of November 17, 2026, Sam's Club's product pages for the Archer BE4600 and the Deco BE4600 each offered "Curbside Pickup" at "Tyler Sam's Club" (Club No. 8284) and identified the product's location in that club as "Aisle A16." See https://www.samsclub.com/ip/TP-Link-Archer-BE4600-Wi-Fi-7-Router/19313104652; https://www.samsclub.com/ip/TP-Link-Deco-BE4600-Wi-Fi-7-Whole-Home-System-3-Pack/19259573843. Each of these clubs is therefore a regular and established place of business of Sam's East, and Sam's East has committed acts of infringement including sales and offers for sale of the Accused Products at each of them.

25. On information and belief, Sam's West has committed acts of infringement in this District by selling and offering to sell the Accused Products to members in this District through

www.samsclub.com and the Sam's Club mobile application, including orders shipped to addresses in this District and orders fulfilled through Sam's Club's in-club pickup, curbside pickup, and same-day delivery programs at the clubs in this District identified above. On information and belief, Sam's West conducts its business from those clubs: online orders are picked, packed, held, handed to members, delivered, and accepted for return at those clubs by personnel who act on behalf of, and subject to the direction and control of, Sam's West, pursuant to policies that Sam's West establishes for the fulfillment of online orders. The Sam's Club clubs in this District are therefore regular and established places of business of Sam's West as well.

26. On information and belief, Sam's West has litigated patent infringement actions in this District without obtaining dismissal or transfer for improper venue. *See, e.g.*, *Team Worldwide Corp. v. Wal-Mart Stores, Inc.*, No. 2:17-cv-00235-JRG (E.D. Tex.) (filed March 29, 2017, against Sam's West, Inc. d/b/a Sam's Club, among others; terminated November 20, 2018); see also *Digital Retail App Inc. v. Sam's Club West, Inc. d/b/a Sam's Club*, No. 2:21-cv-00184-JRG-RSP (E.D. Tex.) (filed May 26, 2021; terminated April 28, 2022).

**SAM'S CLUB'S INFRINGING WI-FI 7 PRODUCTS AND SERVICES**

27. "Wi-Fi 7" is the designation for wireless networking products that implement the IEEE 802.11be amendment to the IEEE 802.11 standard. The Wi-Fi Alliance introduced its Wi-Fi CERTIFIED 7 certification program in 2024. Wi-Fi 7 introduced several new features, including Multi-Link Operation ("MLO"), 320 MHz channels in the 6 GHz band, 4K quadrature amplitude modulation ("4K QAM"), Multiple Resource Units ("Multi-RU"), and preamble (or spectrum) puncturing. *See* https://www.wi-fi.org/discover-wi-fi/wi-fi-certified-7.

28. With MLO, a Wi-Fi 7 access point and a Wi-Fi 7 client device can associate and simultaneously exchange traffic on multiple bands or channels (for example, the 2.4 GHz, 5 GHz,

and 6 GHz bands) and the access point coordinates the traffic among those links, including by steering traffic from one link to another, switching links dynamically based on channel conditions, and restraining transmission on one link while another link is being used to receive. MLO "is a mandatory feature for Wi-Fi 7 certification." *See* https://documentation.meraki.com/MR/Wi-Fi_Basics_and_Best_Practices/Wi-Fi_7_(802.11be)_Technical_Guide; https://blogs.cisco.com/networking/wi-fi-7s-multi-link-operation-mlo-dissection-from-packets-to-performance. For example, in the Enhanced Multi-Link Single Radio ("EMLSR") mode of MLO that many Wi-Fi 7 client devices implement, the client listens on multiple links at once and, depending on the transmit opportunity available on a given link, dynamically switches its radio chains to that link to exchange data, while the access point refrains from transmitting to that client on the other link. Preamble puncturing, likewise a mandatory feature for Wi-Fi 7 certification, allows an access point to "carve out" a portion of a channel that is experiencing interference and to continue transmitting on the remainder of the channel. *Id.*

29. The '939 Patent claims, among other things, an apparatus comprising a wireless input/output unit that is configured to establish a plurality of access points, together with signal transmission/reception coordination logic that monitors those access points for received signals and, upon ascertaining that a first access point is receiving a first signal on a first channel, restrains a second access point from transmitting a second signal on a second, different channel. Wi-Fi 7 routers, mesh systems, and range extenders that implement MLO practice these claims: each establishes a plurality of access points (for example, the 2.4 GHz, 5 GHz, and 6 GHz links of an access-point multi-link device, or the multiple nodes of a Wi-Fi 7 mesh system), monitors those access points for received signals, and restrains transmission on one link or node on one channel while another link or node is receiving on a different channel, as detailed in Exhibit 2.

30. Sam's Club sells, offers to sell, and uses Wi-Fi 7 wireless routers, mesh Wi-Fi systems, access points, gateways, and range extenders that support MLO (collectively, the "Accused Products"), in its clubs and through www.samsclub.com and the Sam's Club mobile application. The Accused Products include, by way of example and without limitation, the following TP-Link Wi-Fi 7 products that Sam's Club sells to its members and stocks for in-club pickup: the Archer BE4600 dual-band Wi-Fi 7 router (Sam's Club item 19313104652) and the Deco BE4600 (Deco 7 BE4600) dual-band mesh Wi-Fi 7 system, 3-pack (item 19259573843), together with all other Wi-Fi 7 routers, mesh systems, access points, gateways, and range extenders supporting MLO that Sam's Club has made, used, sold, offered for sale, or imported, other than any product expressly licensed under the '939 Patent.

31. Sam's Club markets the Accused Products specifically as "Wi-Fi 7" products and advertises their Wi-Fi 7 and Multi-Link Operation capabilities on its product pages. Sam's Club's own product summary for the Archer BE4600, which Sam's Club labels "Generated by AI," states that "Multi-Link Operation lets multiple family members stream and game at the same time," and its product description states that the router delivers "speeds of up to 4.6 Gbps across five simultaneous streams on the 5GHz and 2.4GHz bands" and that "[i]ts advanced Multi-Link Operation ensures efficient data transmission across multiple devices." *See* https://www.samsclub.com/ip/TP-Link-Archer-BE4600-Wi-Fi-7-Router/19313104652. Sam's Club's product page for the Deco BE4600 likewise advertises "Multi-Link Operation (MLO): Wi-Fi 7's MLO boosts throughput, reduces latency, and improves reliability" and "Stronger, More Reliable Backhaul: Supports both wireless and wired backhaul." *See* https://www.samsclub.com/ip/TP-Link-Deco-BE4600-Wi-Fi-7-Whole-Home-System-3-Pack/19259573843. Sam's Club distributes the user guides, quick-start guides, and setup

applications with each Accused Product it sells. *See, e.g.*, https://www.tp-link.com/us/home-networking/wifi-router/archer-be4600/ ("Multi-Link Operation (MLO): Transmits data with Wi-Fi 7 clients across multiple bands simultaneously to increase throughput, reduce latency, and improve reliability for various networking behaviors.").

32. On information and belief, Sam's Club further uses the Accused Products in the United States, including by inspecting, testing, and demonstrating them and by processing returned units.

33. Under Sam's Club's model, members may buy the Accused Products in a club, online for shipment to their homes, or online for in-club pickup or same-day delivery, such that Sam's Club's infringing sales of the Accused Products occur in its clubs and through www.samsclub.com throughout the United States, including in this District.

## COUNT I

## INFRINGEMENT OF U.S. PATENT NO. 8,289,939

34. Vivato realleges and incorporates by reference the foregoing paragraphs as if fully set forth herein.

35. Vivato owns by assignment all rights, title, and interest in U.S. Patent No. 8,289,939, entitled "Signal Communication Coordination." The '939 Patent was duly and legally issued by the United States Patent and Trademark Office on October 16, 2012. A true and correct copy of the '939 Patent is attached as Exhibit 1.

36. Defendants have directly infringed and continue to directly infringe, literally and/or under the doctrine of equivalents, one or more claims of the '939 Patent, including at least claim 30, in violation of 35 U.S.C. § 271(a), by making, using, offering to sell, selling, and/or importing into the United States the Accused Products without authorization. Specifically, on information

and belief: (a) Sam's East has sold, offered to sell, and used the Accused Products in the Sam's Club warehouse clubs that it operates, including the clubs in this District identified above; and (b) Sam's West has sold and offered to sell the Accused Products through www.samsclub.com and the Sam's Club mobile application to members throughout the United States, including members in Texas and in this District, and has sold, offered to sell, and used the Accused Products in the Sam's Club warehouse clubs that it operates. Each of the Accused Products is an apparatus that satisfies the '939 Patent, including at least every limitation of claim 30, as shown in Exhibit 2. Defendants are liable for infringement of the '939 Patent pursuant to 35 U.S.C. § 271(a).

37. The Accused Products satisfy all claim limitations of at least claim 30 of the '939 Patent. Claim charts comparing independent claim 30 of the '939 Patent (together with dependent claims 33-35) to representative Accused Products are attached as Exhibit 2. Exhibit 2 identifies the Wi-Fi 7 functionality, including Multi-Link Operation, dynamic link switching, and preamble puncturing, by which each Accused Product satisfies each limitation of those claims, and Vivato provides it without the benefit of discovery into the Accused Products.

38. Defendants have had actual knowledge of the '939 Patent, and of their infringement of the '939 Patent, at least as of the filing and service of this Complaint, which attaches the '939 Patent (Exhibit 1) and a detailed claim chart (Exhibit 2) that identifies the Accused Products and maps each limitation of at least claim 30 of the '939 Patent to the specific Wi-Fi 7 functionality of those products. Defendants therefore know that the '939 Patent exists and which of the products they sell infringe, which claims they infringe, and how the Accused Products meet each limitation of those claims.

39. Defendants knowingly and intentionally induce infringement of one or more claims of the '939 Patent, including at least claim 30, in violation of 35 U.S.C. § 271(b). Despite their

knowledge of the ’939 Patent, Defendants continue to actively encourage and instruct their members and end users to use the Accused Products in ways that directly infringe the ’939 Patent including by installing and operating them as Wi-Fi 7 routers, access points, and mesh systems with Multi-Link Operation enabled. Among other things, Defendants continue to sell and offer to sell the Accused Products; to advertise and promote their Wi-Fi 7, Multi-Link Operation, and mesh capabilities on www.samsclub.com, in Sam’s Club’s own product summaries and descriptions, and in Sam’s Club clubs; to distribute with each Accused Product the user guides, quick-start guides, and setup applications that direct members to install and operate the product as a Wi-Fi 7 router or mesh system; and to market and sell, alongside the Accused Products, Wi-Fi device installation services. On information and belief, Defendants have not modified the Accused Products, their marketing, or their instructions to steer members toward any non-infringing alternative. Defendants do so knowing and intending that their members and end users will commit these infringing acts, and knowing or being willfully blind to the fact that the acts they induce infringe the ’939 Patent. Accordingly, Defendants specifically intend for others including their members and end users to directly infringe one or more claims of the ’939 Patent in the United States, and it is a reasonable inference that Defendants specifically intended to induce that infringement because Defendants had knowledge of the ’939 Patent and actively induced others to directly infringe it.

40. Defendants also contributorily infringe one or more claims of the ’939 Patent, including at least claim 30, in violation of 35 U.S.C. § 271(c). Defendants sell and offer to sell within the United States, and/or import into the United States, the Accused Products, including individual Wi-Fi 7 routers and mesh nodes that members combine with additional nodes and extenders to form and use the claimed apparatus, knowing that they constitute a material part of

the invention claimed in the ’939 Patent and that they are especially made and especially adapted for use in infringing the ’939 Patent. The Accused Products are not staple articles or commodities of commerce suitable for substantial non-infringing use: they are purpose-built Wi-Fi 7 devices whose Wi-Fi 7 radios and multi-link coordination logic are designed, certified, marketed, and sold to establish and coordinate multiple Wi-Fi links in the manner claimed. And that functionality has no substantial use other than the infringing one. That the Accused Products may also perform other, separable functions such as wired Ethernet switching does not make them staple articles. Defendants have known of the ’939 Patent, and have known that the Accused Products are especially made and especially adapted for use in infringing it, at least since the filing and service of this Complaint, and they nonetheless continue to sell and offer to sell the Accused Products.

41. Defendants’ continued sale, offer for sale, use, and importation of the Accused Products after receiving notice of the ’939 Patent and of the specific infringement identified in Exhibit 2 is knowing, deliberate, and intentional or at a minimum, in reckless disregard of Vivato’s patent rights, and it constitutes willful infringement of the ’939 Patent. Vivato is therefore entitled to enhanced damages under 35 U.S.C. § 284 for Defendants’ infringement of the ’939 Patent, and to a finding that this case is exceptional under 35 U.S.C. § 285.

42. By making, using, offering for sale, selling and/or importing into the United States the Accused Products, and by inducing and contributing to the infringement of others, Defendants have injured Vivato and are liable for infringement of the ’939 Patent pursuant to 35 U.S.C. § 271.

43. As a result of Defendants’ infringement of the ’939 Patent, Vivato is entitled to monetary damages in an amount adequate to compensate for Defendants’ infringement, but in no event less than a reasonable royalty for the use made of the invention by Defendants, together with interest and costs as fixed by the Court.

44. The asserted claims of Vivato's '939 Patent are valid, enforceable, and directed to patent-eligible subject matter.

45. Defendants have had actual notice of the '939 Patent and of their infringement since at least the filing and service of this Complaint, which constitutes notice under 35 U.S.C. § 287(a). Vivato seeks damages for infringement before that date to the extent permitted by 35 U.S.C. § 287.

## PRAYER FOR RELIEF

WHEREFORE, Vivato respectfully requests that this Court enter:

a. A judgment in favor of Vivato that Defendants have infringed, directly and indirectly, either literally and/or under the doctrine of equivalents, the '939 Patent, and that the asserted claims of the '939 Patent are valid, enforceable, and patent-eligible;

b. A judgment and order requiring Defendants to pay Vivato its damages, costs, expenses, and pre-judgment and post-judgment interest for Defendants' infringement of the '939 Patent, in an amount no less than a reasonable royalty;

c. A judgment and order requiring Defendants to provide an accounting and to pay supplemental damages to Vivato, including without limitation, pre-judgment and post-judgment interest, and an award of an ongoing royalty for Defendants' post-judgment infringement in an amount according to proof;

d. A judgment that Defendants' infringement of the '939 Patent has been willful, and an award of enhanced damages pursuant to 35 U.S.C. § 284;

e. A judgment and order finding that this is an exceptional case within the meaning of 35 U.S.C. § 285 and awarding to Vivato its reasonable attorneys' fees and costs against Defendants;

f. Any and all injunctive and/or equitable relief to which Vivato may be entitled

including without limitation ongoing royalties with respect to Defendants' infringement; and

g. Any and all other relief as the Court may deem appropriate and just under the circumstances.

## DEMAND FOR JURY TRIAL

Vivato, under Rule 38 of the Federal Rules of Civil Procedure, requests a trial by jury of any issues so triable by right.

Dated: November 19, 2026

Respectfully submitted,

*/s/ Reza Mirzaie*

Reza Mirzaie (CA SBN 246953)
rmirzaie@raklaw.com
Paul A. Kroeger (CA SBN 229074)
pkroeger@raklaw.com
Philip X. Wang (CA SBN 262239)
pwang@raklaw.com
James N. Pickens (CA SBN 307474)
jpickens@raklaw.com
Ryan K. Lundquist (CO Bar No. 56449)
rlundquist@raklaw.com
Adam Hoffman
ahoffman@raklaw.com
Jacob Buczko
jbuczko@raklaw.com
RUSS AUGUST & KABAT
12424 Wilshire Blvd. 12th Floor
Los Angeles, CA 90025
Phone: (310) 826-7474

***Attorneys for Plaintiff XR Communications LLC dba Vivato Technologies***